UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 17-20392-CR-MARTINEZ

UNITED STATES OF AMERICA,

v.

WILLIE EVENS,

    Defendant.
_____/

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE BASED ON FOURTH AMENDMENT VIOLATION

THIS CAUSE came on before the Court upon an Order of Reference [DE # 17] from the Honorable Jose E. Martinez referring Defendant's Motion to Suppress Evidence Based on Fourth Amendment Violation [DE # 16] (the "Motion") to the undersigned. In response thereto, the United States filed a Response in Opposition to Defendant's Motions to Suppress Physical Evidence [DE # 18] (the "Response"). A hearing was held on the Motion to Suppress on August 14, 2017.[1]

Based upon the undersigned's review of the Motion, the Response and the testimony and arguments presented during the August 14, 2017 hearing, the undersigned recommends that the Motion should be denied for the reasons set forth herein.

I.    Background

---

[1] The hearing was delayed to August 14, 2017 due to a quarantine at the Federal Detention Center, the facility where Defendant is being held.

Defendant was indicted on June 9, 2017 on a single count of possession of a firearm and ammunition by a convicted felon in violation of 18 U.S.C. § 922(g)(1). The charges in this case stem from a search of Defendant's residence by police during which several firearms and numerous rounds of ammunition were found.

II.     The Motion to Suppress and the Response in Opposition

Defendant alleges that the entry by police into Defendant's residence was "unlawful and unreasonable." (Motion at 4). Defendant maintains that no exigent circumstances existed to justify entry of law enforcement into the home. (Transcript at 68-69). Defendant further argues that because the police unlawfully entered the home without a warrant, their observations of "firearms and a large amount of U.S. currency"[2] during a sweep of the home was improperly used as a basis to later obtain a search warrant for the residence. (Motion at 4). As a result, Defendant asks the Court to "suppress all evidence obtained in violation of his constitutional rights, including firearms and ammunition seized from his residence." (Motion at 1).

The government argues that the officers' entry into the Defendant's residence was justified - despite the lack of a warrant – for three reasons. (Response at 1). First, the government argues that "exigent circumstances justified the entry into the Defendant's residence." (Response at 3). Second, the government maintains that "the search is arguably justified as a security sweep incident to the Defendant's arrest." (Response at 4). Third, the government maintains that probable cause existed to support issuance of

---

[2] Detective Cabrera testified during the hearing that during the sweep, officers "found a bag with a large amount of money in quick count bundles" upstairs in the residence. (Transcript at 57). Detective Cabrera further testified that the discovery of the money caused the officers to "call[] the narcotics guys because . . . [m]ost people that deal in narcotics bundle their money." (Transcript at 57). Detective Cabrera recounted, however, that the police found "no evidence of that there was [sic] narcotics transactions involved" "at that time." (Transcript at 57).

the search warrant allowing the officers to enter the residence even without considering the information recounted in the search warrant that the officers gleaned because of the sweep of Defendant's residence.[3] (Response at 4).

III. The Testimony Presented During the August 14, 2017 Hearing

Several witnesses testified during the August 14, 2017 hearing. Defendant's counsel called Defendant and Misty Howard to testify. The government called Officer Ricardo Aguirre and Detective Raul Cabrera both of the Homestead Police Department to testify.

    A.    Testimony of Defense Witnesses

        1.    Misty Howard

Misty Howard testified that she and Defendant had an argument on the morning of May 30, 2017. (Transcript at 10). She testified that after the argument, she left the house to take children to school but she went back to the house when she saw the police. (Transcript at 10). Officers made her get out of the car and the officers "asked if anybody was in the house, that there was gunshots called in." (Transcript at 10).

Misty Howard told the officers "I didn't know anything about it[4] but I heard something." (Transcript at 10). She told officers that her boyfriend, Defendant, was in

---

[3] The government argues that probable cause existed to justify the entry by police into Defendant's residence "even discounting the portion of the search warrant affidavit describing information uncovered during the sweep of the Residence." (Response at 4). Specifically, the government notes that "several 911 calls were made reporting shots fired and a loud argument between a male and female," "upon arrival, law enforcement encountered a 'crying and visibly shaken' female, who advised her boyfriend was still inside the residence threatening to kill himself, further advising that the Defendant fired a gun several times." (Response at 4). There is no need for the undersigned to reach this issue because exigent circumstances existed to justify the warrantless entry into Defendant's residence.

the house. (Transcript at 10). She testified that she told the officers that only Defendant was inside the house but that "there's only three dogs in the house." (Transcript at 12). She also said that the officers mentioned "that they heard something whining" and she responded: "I kept telling them it's the dogs, the dogs." (Transcript at 13 & 16). Misty Howard testified that she "told them at that point the male dog was very attached to me and he was probably trying to figure out while he was still inside without me and he was probably sitting at the door whining because that's what he does." (Transcript at 16).

She said that the officers told her to call Defendant to ask him to come outside the house. (Transcript at 12). She said that the officers handcuffed Defendant and put him into the back of a police car. (Transcript at 13). She then testified that "probably about an hour" later she asked the officers to let her enter the residence to obtain milk for her baby. (Transcript at 13). When she went inside the house with one of the officers, she saw that "the door was wide open and the couch was moved and the closet doors were open." (Transcript at 14). Misty Howard testified that she did not give police permission to enter the residence. (Transcript at 15).

2.  Defendant

Defendant testified that he was drinking the morning of May 30, 2017. (Transcript at 11 & 35). Defendant denied that he was drunk but he stated that he stopped drinking at 7:00 am that morning. (Transcript at 35-36). The officers arrived at approximately 7:22 am. (Transcript at 36).

---

[4]   Although Misty Howard claimed that she "did not know anything about it," Defendant testified that he told Misty Howard that he was going to kill himself and that she saw Defendant go outside with the gun. (Transcript at 30).

Defendant testified that Misty Howard called him when he was inside the house and told him that "they wanted me to come out so they could make sure I was okay." (Transcript at 23). As he left the house, Defendant locked the door behind him. (Transcript at 23). Once outside, the officers detained Defendant – "[t]hey handcuffed me, put me in the car and began to question me." (Transcript at 24).

Defendant testified that the officers asked Defendant to "sign a waiver of consent to search." (Transcript at 24). Defendant refused to sign the waiver. (Transcript at 24). Defendant testified that he did not give officers permission to enter his residence. (Transcript at 25). Defendant testified that the officers kicked the door open and entered the residence. (Transcript at 25).

On cross-examination, Defendant was asked whether he had heard the gunshots that 911 callers had called to report. (Transcript at 29). At first Defendant denied hearing any gun shots. (Transcript at 29). Defendant later admitted, however, that he "fired the shots". (Transcript at 31). Defendant finally acknowledged, after an in-depth cross-examination, that he heard he gunshots – because they were from the weapon that he fired. (Transcript at 31).

Defendant explained that he and Misty Howard fought the morning of May 30, 2017. (Transcript at 29-30). Defendant further explained that he threatened to kill himself during the argument with Misty Howard. (Transcript at 29). Defendant testified that he grabbed a gun and went outside. (Transcript at 30). Defendant testified that he fired the gun and that there were shell casings on the ground. (Transcript at 30). Defendant testified that he came back inside to lie down and that Misty Howard left to take the kids to school. (Transcript at 33). Thereafter, Defendant

received a phone call from Misty Howard to come outside and talk to the police. (Transcript at 33).

  B.  Testimony of Government Witnesses

   1.  Officer Ricard Aguirre

Officer Aguirre testified that at the time of the May 30, 2017 incident, he had only been on the City of Homestead Police force for four years. (Transcript at 38). He testified that he was enroute to work a traffic detail enforcing seatbelt violations when he "heard a call going out of multiple callers advising of shots being fired in the area of Keystone Village." (Transcript at 38). Officer Aguirre proceeded to the scene and after using his vehicle "to block any incoming traffic just in case there was any other shots being fired from that area," he proceeded to assist another officer outside of Defendant's residence. (Transcript at 39-40).

When Officer Aguirre arrived outside Defendant's residence, he "saw a male exiting the residence and [he] stood by officer Hubbard and helped pretty much detain the male that was exiting the residence." (Transcript at 40). Officer Aguirre testified that Officer Hubbard "placed handcuffs on [Defendant] and placed him into the back of his patrol vehicle." (Transcript at 40). Officer Aguirre testified after Defendant was placed into the patrol vehicle, he "responded toward the residence of where the male exited." (Transcript at 40). Officer Aguirre testified that he responded toward Defendant's residence "[d]ue to the nature of the call we wanted to see if there was any victims or any other witnesses that pretty much responded to the residence to see what exactly was occurring." (Transcript at 40).

Officer Aguirre testified that he "stood by the window [of Defendant's residence] which faces the east side and I heard some whimpering or crying coming from incidence the residence." (Transcript at 40). Officer Aguirre further elaborated that when he was at the window, he "heard noise, sounded like footsteps a little bit like footsteps and sounded like somebody crying or whimpering coming from inside." (Transcript at 41). Officer Aguirre testified that he advised over the radio to all of the on-scene officers "[t]hat there was crying and noise coming from inside the residence." (Transcript at 42).

Officer Aguirre testified that he next saw a crying female approaching the residence. (Transcript at 42). He asked her to stop. (Transcript at 42). The crying female advised him that her boyfriend lived at the residence. (Transcript at 43). Officer Aguirre testified that he "asked her if she knew if there was anybody else inside of the residence and she said she didn't know." (Transcript at 43). Officer Aguirre testified that he advised the other officers of the female's statement that she was not sure if anyone else was inside. (Transcript at 43). Officer Aguirre testified that other officers then entered the residence. (Transcript at 43). Officer Aguirre testified that he was not part of the group of officers who went inside the residence. (Transcript at 43). Officer Aguirre left the scene between five and ten minutes after the other officers entered the residence. (Transcript at 43-44).

    2.    Detective Raul Cabrera

Detective Cabrera is a twenty-three year veteran of the City of Homestead Police Department. (Transcript at 51). Detective Cabrera testified that he also responded to a police dispatch report of shots fired. (Transcript at 52). When Detective Cabrera arrived at the Keystone complex (where Defendant's residence is located), he saw that

the officers already on the scene "had a female detained outside with some children." (Transcript at 52). Detective Cabrera proceeded to speak to the female, Misty Howard. (Transcript at 52).

Detective Cabrera asked Misty Howard "if there was any guns or people in the house." (Transcript at 52). He testified that "[a]t first she said that she didn't know nothing about guns or anything like that. After further questioning her she finally said that yes she had an argument earlier with her boyfriend. He basically tried to shoot himself. He had guns. He went outside, shot some, she heard gunshots." (Transcript at 52-53).

Detective Cabrera unequivocally testified that Misty Howard told him that Defendant had threatened to himself and that he then went outside with a gun and she heard gunshots. (Transcript at 53). Detective Cabrera testified that Misty Howard called Defendant on the phone and "he finally came out" of the house. (Transcript at 53). Detective Cabrera then proceeded to speak to Defendant. (Transcript at 53).

Detective Cabrera testified that he asked Defendant if anyone else as in the house. (Transcript at 53). Defendant told him that there was no one else in the house. (Transcript at 53). Detective Cabrera testified that Defendant denied hearing any gunshots, rather Defendant suggested that the noise might have been "kids throwing fireworks." (Transcript at 53).

Detective Cabrera testified that the officers went to check if the door to Defendant's residence was open but the door was locked. (Transcript at 53). Detective Cabrera asked Defendant for a key to the house but Defendant told him that he did not have a key. (Transcript at 53). Defendant Cabrera testified that when he went to the front door of Defendant's residence, he "saw some shell casings on the floor right next to

a vehicle."5 (Transcript at 54). Defendant Cabrera testified that there were four shell (bullet) casings on the ground. (Transcript at 54).

Defendant Cabrera testified that after he observed the shell casings, he told the Lieutenant on the scene: "[w]ell we went over to the Lieutenant and stuff, we were devising a plan to see if anybody was hurt inside or any other subjects." (Transcript at 54). At that time, Defendant Cabrera testified that "[o]ne of our officers went over the radio said he heard like crying or whimpering or something at which time the lieutenant said that we're going to have to go in the house, make sure there's nobody hurt, no other people with guns." (Transcript at 54).

Detective Cabrera further explained the reason why the officers entered the house: "[w]e needed to find out if there was shots fired, we don't know if somebody is dead in there, somebody is hurt, there is another subject in there causing a danger to the community anything like that." (Transcript at 55). Detective Cabrera testified that "we're basically going to do a search for any injuries, any other subjects. Once we determine that we were going to go in, we had to break the door down. Upon entering, we did a basically a sweep for safety and we got to check the area. As soon as coming in there was a gun on the floor right next to the door." (Transcript at 55).

---

5 During Defendant's counsel's final argument during the hearing on the Motion, Defendant's counsel argued that the discovery of the shell casings could not be used as a justification for a finding of exigent circumstances because "those shells were found later. Not at the moment that they got there. They found those shells later adjacent to the yellow SUV." (Transcript at 69). Counsel's argument is not supported by the facts. Detective Cabrera testified that he saw the shell casings on the ground *prior* to the officers entering the residence. (Transcript at 54). Further, Defendant himself testified that there were spent shell casings on the ground outside of his residence which came from his gun after he discharged the weapon. (Transcript at 30). Defendant discharged his gun before the police arrived at his residence – in fact, the sound of gun shots is what prompted the several calls to 911 which led the police to Defendant's residence. (Transcript at 60).

Detective Cabrera testified that "as soon as you walked in [to] the right, the living room area where the gun was on the floor. There was also a bathroom to the left, I cleared that one. There was also a closet there when I opened the closet I saw the rifle and looked liked a handgun and one of the shells . . .". (Transcript at 56). Detective Cabrera testified that the complete sweep of the house took "four, five minutes." (Transcript at 56). He testified that there was no one else inside the house but that "[t]here was a couple of dogs that ended up being in the house." (Transcript at 56). He also testified that "[t]here was a couple of blood drops, two on the floor downstairs." (Transcript at 56).

He further testified that after the sweep of Defendant's residence, the officers all exited the residence. (Transcript at 57). The officers proceeded to apply for a search warrant. (Transcript at 57). The officers called the Narcotics section "because upstairs [other officers] also found a bag with a large amount of money in quick count bundles. Most people that deal in narcotics bundle their money." (Transcript at 57).

Hours later, after the search warrant was issued, Detective Cabrera and officers proceeded to search Defendant's residence. (Transcript at 57-58). He testified that they "recovered the gun on the floor [which] ended up being a pellet gun . . . . Ended up recovering a rifle. A .45 caliber handgun. Another handgun in the kitchen. Another Derringer, small handgun. We also got ammunition, gun cleaning kit. There was probably a little bit of cocaine or suspected cocaine." (Transcript at 58). Detective Cabrera testified that the search was completed at approximately 3:00 p.m. (Transcript at 58). Officer Cabrera testified that Defendant was placed under arrest. (Transcript at 57-58).

C.  Search Warrant

The police later obtained a search warrant to continue to search Defendant's residence. Detective Anthony Green of the Homestead Police Department filed an affidavit in support of the search warrant application. [*See* DE # 24]. Detective Green did not testify at the hearing.

Detective Green's affidavit describes the events of May 30, 2017. The affidavit reads, in relevant part, that officers were dispatched to Defendant's residence at:

> 1066 SE 13th Ave in reference to several calls to 911 advising of several shots heard at the "Premises" and a loud verbal argument between a male and a female. Upon officers arrival they found a female (later identified as Misty Howard . . .) who was crying and visibly shaken along with two small children outside the "Premises". Ms. Howard advised responding officers that her boyfriend (later identified as Willie Evens . . .) who was still inside of the "Premises" was threatening to kill himself after a verbal altercation. Ms. Howard further advised that Mr. Evens discharged the firearm several times.
> 
> Mr. Evens then exited the residence and was detained by responding officers. Officer R. Aguirre (0837) heard what appeared to sound like screams[6] from inside the "Premises". Officers then entered the residence and observed blood just inside the front door on the floor, which elevated their concerns that they [sic] might be victims inside of the "Premises".

[DE # 24-1 at 4 -5].

The Affidavit then recounts that the officers conducted a security sweep of the residence, during which "Det. R. Cabrera (0595) observed a firearm on the floor just

---

[6]  Notably, Officer Aguirre testified unequivocally during the hearing that he did not hear any screams. (Transcript at 47 - 48). Officer Aguirre also testified that he was unaware that Detective Green wrote in his Affidavit that Officer Aguirre had heard screams. (Transcript at 47).

inside the front door and two other firearms on the floor of a hallway closet to the left of the front door." [DE # 24-1 at 5]. Another officer "observed a black bag on the shower floor of an upstairs bathroom containing large amounts of U.S. currency in quick count bundles consistent with narcotics sales. After the security sweep was completed, Mr. Evans [sic] that [sic] was inside the Premises was read Miranda by Det. R. Cabrera and advised that he wanted an attorney present before any questioning." [DE # 24-1 at 5].

IV. Analysis

Based upon the testimony presented to the Court during the August 14, 2017 hearing, the arguments made by counsel during the hearing and in the Motion to Suppress and the Response in Opposition, the undersigned recommends that the Court deny Defendant's Motion to Suppress in this case. The undersigned recommends that the Court find that exigent circumstances existed to justify the warrantless entry and that the subsequent prospective sweep of Defendant's residence was valid.

A. Exigent Circumstances May Justify a Warrantless Entry into a Residence

The Fourth Amendment to the United States Constitution guarantees individuals the right of freedom from unreasonable searches and seizures. "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quotations omitted). The warrant requirement is subject to certain exceptions, however. "[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Id.* (citing *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978)). "One exigency obviating the

requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Id.*

The United States Court of Appeals for the Eleventh Circuit has held that "emergency situations involving endangerment to life fall squarely within the exigent circumstances exception." *U.S. v. Holloway*, 290 F.3d 1331, 1337 (11th Cir. 2002).[7] The burden of proving that a situation justifies application of the exigent circumstances exception to a warrant requirement is on the Government. *See id.* The Eleventh Circuit has held that "the Government must demonstrate both exigency and probable cause." *Id.* "[I]n an emergency, the probable cause element may be satisfied where officers reasonably believe a person is in danger." *Id.* at 1338. The officers' belief must be "objectively reasonable under the Fourth Amendment." *Brigham City*, 547 U.S. at 403.

Here, the officers had an objectively reasonable basis to believe that someone might be seriously injured inside Defendant's residence therefore justifying their warrantless entry into the residence. There were numerous 911 calls that reported shots fired in the vicinity of Defendant's home. (Transcript at 60). Some of the calls

---

[7] The *Holloway* case is very similar to the instant case. In *Holloway*, police received anonymous calls to 911 relaying a report of gunshots and arguing at the appellant's address. 290 F. 3d at 1338. When officers arrived within minutes of the police dispatch, they found the appellant and his wife outside the home. *See id.* The officers entered the home. *See id.* The appellant argued that the officers needed a warrant to enter the home and that all items seized during the officers' subsequent search of the home must be suppressed. *See id.* at 1333.

The Eleventh Circuit rejected appellant's arguments. *See id.* at 1332. The Eleventh Circuit concluded that exigent circumstances existed to justify entry into the home without a warrant. *See id.* at 1338. The Eleventh Circuit found that the reports of gunshots meant that there was the "possibility of a gunshot victim lying prostrate in the dwelling [that] created an exigency necessitating an immediate search." *Id.* Accordingly, the *Holloway* court concluded that "there was probable cause to believe a person located at the residence was in danger" and that "the officers were not required to obtain a warrant before entering" the home. *Id.*

specifically described Defendant's residence as the location where shots were fired. (Transcript at 60).

Officers responded to the 911 calls and arrived on the scene minutes after the calls came in that shots were fired. (Transcript at 52). Upon arrival, officers spoke to Misty Howard, who was crying. (Transcript at 49). Misty Howard told the officers that she and Defendant had fought and that Defendant was still inside. (Transcript at 52-53). Misty Howard also told officers that Defendant "basically tried to shoot himself" and that "[h]e had guns." (Transcript at 52 & 53). Misty Howard further told the officers that Defendant had left the residence with a gun, she heard gun shots and then Defendant came back into the house. (Transcript at 53).

Detective Cabrera testified that the officers "couldn't get anybody out" of the house. (Transcript at 53). He testified that Defendant finally came out of the house after Misty Howard called him and told him that the police wanted to speak to him. (Transcript at 53).

Defendant testified that he had been drinking and that he only stopped drinking[8] when he came home that morning. (Transcript at 35-36). Defendant acknowledged that he had an argument[9] with Misty Howard during which he threatened to kill himself. (Transcript at 28-29). Defendant testified that he grabbed a gun and went outside. (Transcript at 30). Defendant further testified that he discharged the gun several times

---

[8] Defendant disputes that he was drunk when the officers arrived. Although he acknowledged that he was drinking until he came home "[a]round 7 something or a little before 7 something, around like 6 . . . . Once I saw the officers, I was dead sober." (Transcript at 35-36).

[9] Defendant testified that he and Misty Howard argued because he came home late. (Transcript at 36).

outside of his residence and he acknowledged that there were spent shell casings on the ground. (Transcript at 30-31).

Detective Cabrera testified that he saw spent shell casings on the ground when he walked to the front door of the residence. (Transcript at 54). Officer Aguirre testified that he heard whimpering and crying sounds coming from inside the house. (Transcript at 40, 41, 42 & 47). The objective facts presented a sufficient basis for the officers to reasonably believe that someone might be injured or hurt inside the house – there were several calls to 911 of shots being fired; when officers arrived, they found a crying female who recounted that she had a fight with her boyfriend during which he threatened to kill himself. Moreover, officers found shell casings on the ground and Defendant at first refused to come out of the house. Then, after Defendant came outside the house, officers heard crying and whimpering from inside the house. Based upon all of these factors, it was reasonable for the officers to believe that a person might be in danger inside Defendant's residence. Therefore, the undersigned finds that exigent circumstances existed to justify the police officers' decision to enter the residence without a warrant.[10]

B. Officers May Conduct a Protective Sweep of a Premises Without a Warrant

In *Maryland v. Buie*, 494 U.S. 325, 334 (1990), the United States Supreme Court held that police may, incident to an arrest, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately

---

[10] The undersigned finds that the government witnesses were highly credible during their testimony. After listening to the testimony of the police officers, the undersigned concludes that they testified solely as to the facts without regard to the outcome. Defendant, on the other hand, has an obvious interest in the outcome of this hearing. Given the inconsistencies in the testimony of Defendant and the defense witness Misty Howard, the undersigned finds that the defense witnesses were not credible.

adjoining the place of arrest from which an attack could be immediately launched." The Court warned, however, "that there must articulable facts, which taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* The Court further explained that the "protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335.

The *Buie* court made clear, however, that the "Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 334. The Court emphasized that a search incident to arrest is not automatic. *Id.* at 335. Rather, the Court made clear that a search "may be conducted only when justified by a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the arrest scene." *Id.*

In 2014, the United States Court of Appeals for the Eleventh Circuit issued its decision in *United States v. Yeary*, 740 F.3d 569, 579 (11th Cir. 2014)[11] which interpreted the Supreme Court's decision in *Buie*. In *Yeary*, officers went to serve an

---

[11] In *Yeary*, the defendant challenged searches of two separate properties – one in Stuart, Florida and one in Lake Worth, Florida. 740 F.3d at 578-79. The search of the Stuart property in *Yeary* is similar to the search in the instant case thus the undersigned's analysis is limited to the *Yeary* decision's discussion of the Stuart property.

arrest warrant on Yeary. 740 F.3d at 578. Yeary cooperated by coming outside of his residence, where he was arrested. *Id.* at 580. There were two other people in the residence. *Id.* The officers re-entered the residence and conducted a protective sweep. *Id.* During the protective sweep, officers saw firearms, narcotics and narcotics paraphernalia in plain view. *Id.*

Yeary challenged the officers' entry into his residence as unlawful and he moved to suppress the evidence that the officers seized during the warrantless search. *Id.* at 571. The district court upheld he search "on the ground that the search was a valid protective sweep." *Id.* at 579. The Eleventh Circuit affirmed the trial court's decision finding the sweep lawful because "[l]aw enforcement officers are permitted, in the context of a valid arrest, to conduct a protective sweep of a residence for officers' safety." *Id.* (citing *Buie*, 494 U.S. at 333-35). The Eleventh Circuit made clear that "[s]uch a sweep must be brief and limited to areas from which an attack could be launched." *Id.*

The Eleventh Circuit explained in detail its conclusion that the "deputies conducted a valid protective sweep of the Stuart residence":

> First, the arrest warrant, standing alone, would have given deputies authority to enter the home . . . . Of course, the deputies did not enter the home to make the arrest; Yeary cooperated, left the home and was arrested – but only *after* he deputies saw a firearm in plain view. The deputies then learned of the presence of two unknown individuals in the residence. Based on these two facts, the deputies could have reasonably suspected that they were in danger. Moreover, the sweep was limited in scope; it was only coincidental that one of the deputies discovered contraband in plain view while conducting the sweep . . . . We therefore hold that the Stuart search was valid.

740 F.3d at 580 (citations omitted).

Although the officers' preliminary search of Defendant's residence in the instant case was not pursuant to an arrest, it bears sufficiently similarity to the search in *Yeary* to be considered a valid protective sweep.[12] For the reasons identified in Section IV(A) *supra*, the officers had a reasonable basis to enter Defendant's home based on exigent circumstances. Once inside, the officers saw a firearm in plain view close to the front door. (Transcript at 55). One officer testified that Misty Howard was equivocal about whether there was anyone else inside the home. (Transcript at 43).

---

[12] There was a discussion during the hearing about whether Defendant was under arrest at the time that the officers entered his residence. (Transcript at 3 & 72). Whether Defendant was under arrest is of no moment, however. In *Holloway*, the Eleventh Circuit concluded that the officer's warrantless entry into the appellant's home was justified based on exigent circumstances. 290 F. 3d at 1338. Once the officers were inside the home, the officers "had reasonable cause to believe they were entering a volatile and potentially dangerous situation based on the prior report of gunshots. As a result, officer safety demanded the individuals present on the premises be temporarily secured prior to conducting their search . . . . *Once those individuals were under control, Officer Bernard was able to conduct a limited search of the residence.*" *See id.* at 1340 (emphasis added).

The *Holloway* court rejected the appellant's argument that the officer's seizure of the weapons he saw after entering the home was unconstitutional. 290 F.3d at 1340-41. The Eleventh Circuit explained: "[d]uring his search, Officer Bernard located a shotgun, which was likely the cause of the disturbance, in plain view. Because his warrantless presence on Appellant's property was justified by the exigencies of the situation, the officer was authorized to seize the shotgun without a warrant. *See Mincey v. Arizona*, 427 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978) ("[T]he police may seize evidence that is in plain view during the course of their legitimate emergency activities."); *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971) ("Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate.") The seizure of the firearm and other evidence, therefore, was constitutional." *Holloway*, 290 F.3d at 1340-41.

Similarly, Defendant's argument that the firearms and ammunition found in his residence should be suppressed. Similar to *Holloway*, exigent circumstances existed to justify the officers' entry into Defendant's residence. Once inside, the officers saw a firearm in plain view. The officers then conducted a brief sweep of the residence. Critically, in this case, the officers did not seize anything at that time. Rather, the officers left the home and proceeded to obtain a search warrant to thoroughly search the home. As the officers "warrantless presence" on Defendant's property was justified by exigent circumstances, the officers had authority to seize observe – and even seize – the firearms and ammunition. *See id.* at 1340.

Further, the officers heard crying or whimpering coming from inside the residence – these sounds could indicate the presence of a person inside the residence. For these reasons, similar to the officers in *Yeary*, the officers in this case could have reasonably suspected that they were in danger. Thus, the officers were justified in engaging in a protective sweep.

Furthermore, also similar to the sweep in *Yeary*, the officers here also conducted a limited sweep of the residence. The sweep lasted only four or five minutes. (Transcript at 56). Based on what officers saw in plain view during the sweep, the officers left the house, locked the residence and proceeded to obtain a search warrant. (Transcript at 57). As the sweep here was aimed at protecting the officers who went into the home and was a brief four to five minute "cursory inspection of those spaces where a person might be found", *Buie*, 494 U.S. at 334, the sweep was valid and the items discovered during that search – and which served as a basis for the later issuance of a search warrant[13] – should not be suppressed.

V.  Conclusion

In sum, based upon a review of the Motion, the Response and the testimony and arguments presented during the August 14, 2017 hearing, it is hereby RECOMMENDED that: Defendant's Motion to Suppress Evidence Based on Fourth Amendment Violation [DE # 16] be DENIED.

---

[13] The undersigned need not reach the government's third (alternative) argument that sufficient probable cause existed to support issuance of the search warrant even if the Court were to find that the officers' warrantless entry into the residence was not justified because there was sufficient probable cause for officers to search the home aside from "the portion of the search warrant affidavit describing information uncovered during the sweep of the Residence." (Response at 4). There is no need for the undersigned to reach this issue, however, because exigent circumstances existed to justify the entry of the officers into Defendant's residence even without a warrant.

Pursuant to S.D. Fla. Magistrate Rule 4(b), the parties shall have until August 24, 2017 to serve and file objections to this Report and Recommendation. Any response to objections must be served and filed on or before August 28, 2017. Failure to file timely objections may bar the parties from attacking on appeal the factual findings contained herein. *See LoConte v. Dugger*, 847 F.2d 745, 750 (11th Cir. 1998), *cert. denied*, 488 U.S. 958 (1988).

DONE AND ORDERED in Chambers at Miami, Florida this 21 day of August, 2017.

BARRY L. GARBER
UNITED STATES MAGISTRATE JUDGE